# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| TESSA R. TRAHAN | * | CIVIL ACTION NO. 05-1288 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Tessa A. Trahan, born May 13, 1965, filed applications for disability insurance benefits and supplemental security income payments on September 11, 2003, alleging disability as of September 5, 2002, due to back problems, intercostal neuritis, a rib contusion, and a torn annulus.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dr. Matthew Mitchell dated March 20, 2003 to September 19, 2003**. Claimant was referred by Dr. Gillespie for pain in her left rib cage and left sacral area since an automobile accident on June 26, 2000. (Tr. 223). She had been off of work since September 5, 2003.

On examination, claimant's back flexion and extension was decreased secondary to pain and guarding. (Tr. 224). Her back was tender in her left T9 through T12 region. She had a slightly reddish, minimally swollen area in her left chest wall. Her SI joint was tender on the left. Dr. Mitchell's impression was intercostal neuralgia.

On April 4, 2003, Dr. Mitchell performed radiofrequency thermocoagulation of the intercostal nerves to relieve the pain. (Tr. 218). On May 12, 2003, Dr. Mitchell reported that claimant's intercostal neuralgia was significantly better. (Tr. 212). He wrote on May 19 that "[i]f she can tolerate the pain she should return to work." (Tr. 211).

On May 29, 2003, claimant complained of low back and left hip pain. (Tr. 208). She stated that her left leg had been giving out after she recently sprang her left ankle. She also reported left arm weakness.

2

An MRI showed a tear in claimant's lumbar disc at the L5-S1 level. (Tr. 204). Dr. Mitchell opined that the disc protrusion with annular tear "may certainly be causing her pain." His diagnosis was lumbar radiculopathy secondary to a herniated disc at L5-S1, and intercostal neuritis. He treated her with medications and injections. (Tr. 205).

On September 11, 2003, claimant complained of having significant pain in her lower back which radiated down into her left leg, with numbness and weakness in her legs. (Tr. 189). Dr. Mitchell noted that she had not responded to the epidural injections. His impression was lumbar radiculopathy. He referred her to Dr. Muldowny for surgical evaluation.

**(2) Records from Dr. Louis Blanda dated October 8-9, 2003**. Claimant complained of rib, low back, tailbone, and left leg pain. (Tr. 237). On examination, she had good range of motion in the neck with left shoulder/trapezius spasms. (Tr. 239). She had decreased flexion and extension with guarding due to low back pain. Her strength was 4/5 in the left arm and leg. Straight leg raise testing was positive on the left.

**(3) Residual Functional Capacity ("RFC") Assessment dated November 4, 2003**. The examiner determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 243). She could stand/walk and sit about

3

6 hours in an 8-hour workday. She had unlimited push/pull ability. She had occasional postural limitations. (Tr. 244). The examiner found that claimant could perform all routine self care and chores. (Tr. 247).

**(4) Records from Dr. Mitchell dated December 4, 2003 to January 12, 2004**. On January 12, 2004, claimant complained of neck, back, and leg pain. (Tr. 250). She also reported that her legs gave out her quite often, causing her to fall. Additionally, she noted a decrease in neck function, and feeling depressed because of pain.

A bone scan showed faint uptake within the left lateral rib # 7 and faint anterior uptake, which Dr. Mitchell felt was related to her lumbar disc disease. (Tr. 251, 255). A myelogram and CAT scan ordered by Dr. Blanda showed mild spondylosis at L4-5 and L5-S1, C5-6 central spondylosis, and a small lipoma on the left dorsal nerve root at approximately T11. After reviewing the results, Dr. Blanda did not recommend surgery.

The latest physical therapy notes indicated that claimant still had severe spasm in the cervical region, trapezius scalenes, and severe spasm and pain in the throracic region and intercostal areas.[1] (Tr. 251, 257). She had moderate-to-severe spasm in

---

[1]Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(e) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

4

the lower back, quads, and gluteals. Dr. Mitchell continued physical therapy for another six weeks. His impression was cervical, thoracic, and lumbar back pain, and a history of pain and weakness in the upper and lower extremities. (Tr. 253).

**(5) Records from Dr. deAlvare dated June 17, 2002 to July 17, 2002**. Claimant was seen for numbness and tingling of her left arm, rib pain, low back pain, left leg weakness and tingling, worsening migraines, and insomnia. (Tr. 266). On examination, cervical range of motion was full. (Tr. 267). She had good motor power in the extremities. She had some give-way type weakness proximally in the left lower extremity. Straight leg raising was negative. (Tr. 268).

Dr. deAlvare's impression was cervical myofascial syndrome, TMJ injury, left arm weakness and numbness of unknown etiology, thoracic pain syndrome, and a pelvic problem. He prescribed medications, physical therapy, and recommended nerve conduction/EMG studies of the upper extremities.

On July 17, 2002, Dr. deAlvare reported that claimant was making progress. (Tr. 264). Her physical therapist indicated that her rib had rotated out of position and he popped it back into place, but it came back the next day. Dr. deAlvare thought that she might have a hypermobile rib, and recommended more therapy. He increased her medications.

5

**(6) Lumbar MRI dated July 1, 2003**. The MRI showed an L5-S1 minimal central disc protrusion with posterior annular tear. (Tr. 269).

**(7) Records from Louisiana Pain Management dated June 17, 2004**. Claimant reported headaches from the top of her head and down her spine. (Tr. 271). She complained that the pain was occasionally so intense that she became nauseated, vomited, and cried. She also stated that her legs gave out and that she felt weak. On examination, she had limited spinal and neck range of motion due to pain. She had decreased sleep, which increased her pain. The impressions were intercostal neuropathy, cervical and lumbar radiculopathy, and fibromyalgia. (Tr. 272). She was prescribed Provigil, Skelaxin, Methadone, and trigger point gel.

**(8) Consultative Examination by Dr. Walter A. Lajara-Nanson of Texas Tech University dated October 15, 2004**. Claimant complained of unrelenting neck pain radiating down her back and into the legs. (Tr. 274). She also reported urinary incontinence and loss of rectal sphincter tone. Additionally, she reported a "cold feeling" and purple discoloration in the left arm and leg intermittently, weakness with a loss of fine motor coordination in the left extremities, and loss of sensation on the left side.

On examination, claimant had a notable loss of fine motor coordination in the left upper and lower limbs. (Tr. 275). She had a mild left hemiparesis. Strength was

6

5/5 throughout all major muscle groups, although there was some limitation secondary to severe pain. Sensory, there was a loss of pain, temperature, vibratory and proprioception in the left hemibody with remarkable loss of proprioception in the left foot. She had no evidence of any cortical sensory loss. Reflexes were 2-3 and symmetric in the lower limbs, 2 and symmetric in the upper limbs with downgoing toes.

Dr. Lajara-Nanson suspected was that there had been some form of an insult to the cervical spine cord producing an element of a deep-segmental pain syndrome. He recommended an MRI of the brain and spinal cord. He noted that many of his patients with similar injuries had responded well to botulinum toxin therapy applied to the paraspinal muscles.[2] He thought that the autonomic findings as well as low rectal sphincter tone and bladder disturbances could be attributed to a form of cervical myelopathy.

**(9) Records from Dr. Matthew Mitchell dated April 14, 2004**. Claimant presented with continued low back and buttock pain, which she rated as a 9 out of 10. (Tr. 277). She reported that the Neurontin, Ultram, Elavil, and Vioxx had been helping with the pain. She was also taking Lortab four to six times a day for breakthrough pain. She said that the Skelaxin had helped significantly. She was

---

[2]Claimant testified at the hearing that she had about 25 Botox injections. (Tr. 54).

seeing a counselor for depression.

Recently, claimant had developed spasms in the back of the neck which extended up into her head, causing severe headaches. She rated her headaches as a 10 out of 10.

On examination, pressure over claimant's occipital nerves reproduced her headaches. She still had severe pain in the chest and back. Her deep tendon reflexes were quite decreased on the left.

Dr. Mitchell's impressions were occipital neuralgia; chronic cervical, thoracic, and lumbar pain; symptoms consistent with a lumbar radiculopathy with decreased deep tendon reflexes on the left, and intercostal neuritis. He recommended continued physical therapy, psychological visits, medications consisting of Zoloft, Ultram, Bextra, Elavil, Ambien, Methadone, and Skelaxin, and trigger point injection over the occipital nerves.

**(10) Report from Dr. Stephen Goldware dated January 18, 2005**. Claimant was referred by Dr. deAlvare for evaluation of neck and lower back pain. (Tr. 280). On examination, claimant was 5 feet 4 inches tall and weighed 198 pounds. (Tr. 282). Dr. Goldware noted that her gait was strange, and might "very well be spastic." He noted that she weighed almost 200 pounds and "walks with vigor." (Tr. 284).

Claimant had no muscle weakness. (Tr. 283). Deep tendon reflexes were generally increased at 3+ throughout. She had decreased sensation in her left hand, but no sensory loss.

On cervical examination, claimant had a normal curve with no bruising. Her neck was supple, and had a full, painless range of motion. Muscle tone was normal with no tenderness.

Claimant's Tinel's sign was positive at the left wrist. Her Phalen's sign was absent.

On lumbar exam, claimant had a normal curve. She was able to flex well and laterally bend without difficulty. Muscle tone seemed normal. Straight leg raising was negative bilaterally.

Dr. Goldware's impression was cervical myelopathy. He recommended EMG NCV studies, a spine series, and weight reduction. (Tr. 283-84).

**(11) Records from Dr. deAlvare dated January 24, 2005**. EMG/NCV studies were normal. (Tr. 285-88).

**(12) Operative Report from Dr. Luiz C. deAraujo dated August 11, 2005**.[3] Dr. deAraujo performed an anterior cervical microdiscectomy and fusion at C5-6 with bone graft and stabilizing plate. (rec. doc. 7, Exhibit B). The diagnosis was

---

[3]This report was submitted in support of claimant's request for remand.

9

spondylotic disease and herniated intervertebral disc at C5-6 leading to cervical radiculopathy.

**(13) Claimant's Administrative Hearing Testimony**. At the hearing on November 8, 2004, claimant was 39 years old. (Tr. 32). She was a high school graduate, and had completed 12 hours of childcare training. She reported that she was 5 feet 5 inches tall and weighed 190 pounds, which was high.

Claimant testified that she had worked as a daycare worker. (Tr. 34). She had stopped working on September 5, 2002, after Dr. Blanda told her that it was best. She said that she could not work because of a spinal cord injury from her neck down after an automobile accident in 2000. (Tr. 35). She reported that she had worked for two years after the accident, but that her aide had done most of the work. (Tr. 35-36).

Claimant complained that she still had pain from the top of her neck down into her legs, particularly on the left side. (Tr. 36). She also reported left-sided rib pain. (Tr. 40). She said that she had been diagnosed by Dr. Lazaro with fibromyalgia. (Tr. 48).

Claimant described her pain as a 10 on a scale of 1 to 10 without medication, and about an 8 with medication. (Tr. 37). She stated that the pain medications made her drowsy, upset her stomach, and gave her a dry mouth. (Tr. 39, 50, 53, 55). She also reported that she was taking antidepressants and stomach medication. (Tr. 49-

50).

Additionally, claimant stated that her leg gave out and she kept falling because of her spinal problem. (Tr. 39). She reported that she had a blood clot in her right leg as a result of falling. (Tr. 41, 52). She testified that she had borrowed a wheelchair from a neighbor for the hearing because she had fallen the night before. (Tr. 40). She said that she also used crutches that belonged to her grandmother.

Claimant reported that she saw a therapist three times that year. (Tr. 38). She stated that she had stopped because she started going to physical therapy. She said that she had also started going to Bible study, which helped some. (Tr. 38-39).

Regarding activities, claimant testified that she drove about three times a week. (Tr. 33). She stated that she did minimal housework, such as washing dishes and cooking some meals. (Tr. 43). She reported that she grocery shopped very little.

Additionally, claimant complained that she could not get out of the tub, so she had started taking showers. (Tr. 44). She stated that her daughter helped fix her hair because she could not lift her left hand a lot. She stated that she attended church every Sunday, and went to Bible study on Tuesdays for about 30 minutes. (Tr. 45).

As to limitations, claimant testified that she could sit for about 30 minutes before her back started hurting. She said that she could stand about 30 minutes before her legs gave out. (Tr. 46). She reported that she could walk about 10 feet.

Additionally, claimant stated that she could lift about five pounds. She stated that her left hand became numb. (Tr. 46, 56). However, she said that she could pick up small objects with her left hand. (Tr. 47).

**(14) Administrative Hearing Testimony of Dr. George Hearn, Vocational Expert ("VE")**. Dr. Hearn described claimant's past work as a nursery school attendant or childcare worker as light and semiskilled. (Tr. 59). The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience; who was limited to light duty involving no fine manual manipulation and lifting no more than five pounds with the dominant left hand, and who could only occasionally stoop, crouch, crawl, kneel, climb, or balance. (Tr. 60). In response, Dr. Hearn testified that she could not do her past work. However, he determined that she could work as an assembly line worker, of which there were 870,000 jobs nationally and 5,000 statewide; food service worker, of which there were 500,000 jobs nationally and 8,000 statewide, and housekeeper, of which there were 250,000 jobs nationally and 5,000 statewide. (Tr. 61-63).

The ALJ posed another hypothetical in which he assumed a claimant who was limited to sedentary work involving no fine manipulation no lifting over five pounds with the left dominant hand, and no operation of foot controls with the left foot. (Tr. 63). In response, the VE identified the jobs of dispatcher, of which there were

175,000 jobs nationally and 3,000 statewide, and assembly worker, of which there were 175,000 jobs nationally and 2,000 statewide. (Tr. 63-64).

When the attorney changed the hypothetical to assume a claimant who frequently dropped things with the left hand, Dr. Hearn testified that it would interfere with consistency of production in the assembly line work. (Tr. 65). Claimant's attorney also asked whether the light duty jobs would be affected if claimant had to lie down and rest after a half hour of standing up or sitting, to which Dr. Hearn replied that they would. (Tr. 66-67).

**(15) The ALJ's Findings are Entitled to Deference**. Claimant argues: (1) the ALJ's reliance solely on the opinion of the Disability Determinations Services examiner was error, and (2) this case should be remanded based on the new evidence of surgery by Dr. deAraujo.

As to the first argument, the record reflects that the ALJ did not rely solely on DDS's opinion. (rec. doc. 7, p. 4; Tr. 17). In fact, while the ALJ agreed with the examiner's opinion that claimant could perform light work, he found that claimant had some additional non-exertional limitations. Thus, it is evident that the ALJ did not rely solely on DDS's opinion.

Additionally, the record reflects that the ALJ considered not only the opinion from DDS, but also the reports from claimant's treating physicians. (Tr. 19). The

13

ALJ noted that several EMG/NCS studies performed over the years were normal. (Tr. 19, 265, 285-88). Additionally, he cited the MRI indicating that she had minimal L5-S1 central disc protrusion with annual tear. (Tr. 269). He further observed that her treating pain specialist, Dr. Mitchell, reported that claimant's medication had been helping with the pain, and that the Skelaxin had helped "significantly." (Tr. 277). Thus, claimant's allegation that the ALJ "solely" considered DDS's opinion lacks merit.

Next, claimant objects to the ALJ's statement that none of her treating physicians have indicated that she should limit her work activity. (rec. doc. 7, p. 5; Tr. 17). She argues that "Dr. Blanda told her to quit working if she ever wanted to get better." (rec. doc. 7, p. 5; Tr. 34). However, Dr. Blanda's records do not confirm this. (Tr. 237-41). Thus, this argument lacks merit.

Claimant further argues that the ALJ erred in stating that there were "only four factors" indicating the existence of severe pain. (rec. doc. 7, p. 5; Tr. 18). However, the record reflects that the ALJ did not limit his consideration to those four factors, but used them as examples. (Tr. 18). It is settled that the absence of objective factors indicating the existence of severe pain -- such as limitations in the range of motion, muscular atrophy, or impairment of general nutrition, could itself justify the ALJ's conclusion. *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988). In support of the

ALJ's finding, he cited Dr. Goldware's report that claimant weighed almost 200 pounds and walked with vigor. (Tr. 18, 284). As the ALJ's finding is supported by the evidence, it is entitled to deference.

Further, in evaluating claimant's pain, the ALJ considered not only the absence of the stigmata indicating severe pain, but also her treatment. (Tr. 18-19). The Fifth Circuit holds that disabling pain must be constant, unremitting, wholly unresponsive to therapeutic treatment, and corroborated in part by objective medical testimony. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991). As the ALJ noted, Dr. Mitchell's report dated April 14, 2004, indicated that claimant's pain medication was helping, and that the Skelaxin had "helped significantly." (Tr. 19, 277). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). Accordingly, the ALJ's finding regarding claimant's pain is entitled to deference.

Next, claimant argues that the ALJ failed to properly address the side effects from her medications. (rec. doc. 7, pp. 6-7). However, the record reveals that the ALJ specifically asked claimant about any side effects at the hearing. (Tr. 39). Additionally, the ALJ's decision referred to claimant's testimony as to these side

effects, which included drowsiness, nausea, and vomiting. (Tr. 18). Further, the ALJ cited 20 C.F.R. §§ 404.1529, 416.929, and SSR 96-7p, which require the ALJ to consider the side effects of medications. Thus, contrary to claimant's argument, the record reflects that the ALJ properly considered the side effects from her medications.

Next, claimant argues that the ALJ erred in failing to include any limitations in the hypotheticals to the vocational expert concerning her falling due to her left leg giving out, and her dropping things with her left hand. (rec. doc. 7, pp. 7-9). The ALJ noted that claimant's subjective complaints were credible only to the extent that they were consistent with the objective medical evidence. (Tr. 19). Based on this evidence, he found that she retained the RFC to perform a limited range of light work, in that she was precluded from fine manipulation and no lifting over five pounds with her dominant left hand, and could occasionally crouch, crawl, kneel, climb, and balance. (Tr. 19, 60-63).

The record reflects that claimant's attorney included limitations in the hypotheticals to the VE regarding her dropping objects with her left hand and her inability to stand or sit for more than a half-hour. (Tr. 65-68). The ALJ found that these limitations were not supported by the objective evidence. (Tr. 18-19). It is well established that the ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ. *See Owens v. Heckler,* 770 F.2d 1276,

1282 (5th Cir.1985); *Falls v. Apfel*, 2000 WL 329233, *7 (E.D.La.2000). As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or his representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Claimant additionally argues that there is no evidence to support the ALJ's conclusion that she could sustain gainful activity, citing *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002). (rec. doc. 7, p. 8). However, since the issuance of its decision in *Watson*, the Fifth Circuit has determined that the Commissioner is not required to make a specific finding regarding the claimant's ability to maintain employment in every case. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). As the court stated in *Frank*:

> *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if [plaintiff] had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. **At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time**. An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the

> ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added). *Id*. at 619.

Here, claimant has not demonstrated that her symptoms were of sufficient frequency or severity to prevent her from holding a job for a significant period of time as required by *Watson*. As noted by the ALJ, the objective evidence does not support the severity of the complaints alleged by claimant. (Tr. 18-19). Thus, this argument lacks merit.

Finally, claimant argues that this matter should be remanded in light of Dr. deAraujo's report indicating that he performed surgery on August 11, 2005. (rec. doc. 7, p. 10, Exhibit B). When new evidence becomes available after the Commissioner's decision and there is a reasonable possibility that the new evidence would change the outcome of the decision, a remand is appropriate so that this new evidence can be considered. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). In order to justify a remand, the evidence must be (1) new, (2) material, and (3) good cause must be shown for the failure to incorporate the evidence into the record in a prior proceeding. *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995).

Reviewing the materiality of the new evidence requires the court to make two separate inquiries: (1) whether the evidence relates to the time period for which the disability benefits were denied, and (2) whether there is a reasonable probability that this new evidence would change the outcome of the Secretary's decision. *Ripley*, 67 F.3d at 555.

In this case, Dr. deAraujo's report is dated August 11, 2005, which is almost six months after the ALJ's decision. Thus, this evidence does not relate to the relevant time period, and remand is inappropriate. However, claimant might use this evidence as the basis for filing a new application.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 10th day of May, 2006, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE